J-S47001-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.W.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: E.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2011 EDA 2023 |

Appeal from the Decree Entered July 12, 2023
In the Court of Common Pleas of Delaware County
Orphans' Court at No: 0018-2023-A

BEFORE: STABILE, J., KUNSELMAN, J., and STEVENS, P.J.E.*

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 1, 2024**

E.H. ("Mother") appeals from the July 12, 2023 decree granting the petition of Children & Youth Services of Delaware County ("CYS" or "the Agency") and involuntarily terminating her parental rights to her son, A.W.H. ("Child"), born in July 2016, pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b).[1] After careful review, we affirm.

The orphans' court aptly summarized the factual and procedural history as follows:

> In April or May of 2020, Mother abandoned Child by "dropping off" Child with her sister. . . . Mother never returned

---

* Former Justice specially assigned to the Superior Court.

[1] By separate decrees dated July 5, 2023, the orphans' court terminated the parental rights of Child's putative father, M.B. The court further terminated the parental rights of John Doe or any other person claiming paternity. Neither M.B., John Doe, nor any other person claiming paternity filed an appeal.

for Child and had no visits with Child [during the course of his dependency]. At the time of the termination hearing, Mother had been absent from Child's life for three of Child's seven years.

For about a year from April or May 2020 until June 2021, Child "bounced around" between members of Mother's family. In June 2021, Child settled in with his maternal aunt, maternal uncle, and their two children. Child has resided continuously with his maternal aunt and uncle since June 2021.

It is undisputed that Mother got lost in a labyrinth of drug addiction, homelessness, criminality, and mental health issues. Mother's whereabouts were unknown from April/May of 2020 until [November] 2022 when she was arrested. Mother had been living on the streets of the Kensington section of Philadelphia using heroin, crack cocaine, and fentanyl. During this time Mother was neglecting herself as well as her child.

. . .

. . . Child was adjudicated dependent on June [28], 2021. Legal and physical custody was transferred to CYS, and Child was placed in kinship foster care with his maternal aunt and uncle [("Foster Parents")]. . . .[2]

. . .

There have been multiple review hearings in this case. CYS made all reasonable efforts to notify Mother of each hearing and to make services and assistance available to her. Mother was living on the streets and abusing drugs, CYS could not find or establish contact with Mother. Mother's whereabouts were unknown to CYS as well as her own family. Mother did not contact CYS for over two years. Mother failed to appear at most hearings, did not timely request visitation, did not take advantage of any

---

[2] Mother and Child previously came to the attention of the Agency in 2016, following Child's birth, due to allegations that Mother had a substance abuse history and relapsed during her pregnancy. *See* N.T., 6/13/23, at 122.

assistance or support available to her, and did not visit with Child for three years.[3]

On October 6, 2022, the permanency goal was changed from reunification to adoption. Mother's prolonged absence and lack of progress toward eliminating the issues that caused Child to be found dependent were factors in this court's decision to change the permanency goal.[4]

. . .

It is uncontroverted that following Mother's arrest in [November] 2022, Mother made impressive personal progress and began making better decisions. Over the seven months preceding the termination hearing, Mother's progress or accomplishments included the following: a) getting and staying substance-free; b) resolving the pending criminal charges; c) completing inpatient rehab at Recovery Centers of America; d) moving into a recovery house (known as Freedom House); e) scheduling and taking a parenting class; f) taking her high school equivalency exam; g) getting her driver's license; and h) obtaining employment.

Orphans' Court Opinion, 9/12/23, at 3-8 (cleaned up) (footnotes omitted) (citations to record omitted). At the time of the subject hearing, Mother

_____

[3] Throughout permanency review hearings from October 2021 to June 2022, the court maintained Child's permanency goal and placement. The court further characterized Mother as noncompliant with the permanency plan and recognized no progress alleviating the circumstances which necessitated placement. *See* CYS Exhibit 1, Exhibit 9 (permanency review orders).

[4] Pursuant to this order, the Agency was further "relieved of providing further reunification services and visitation. Should Mother contact the Agency, visitation and services may be provided if deemed appropriate by the Agency. If the Agency refuses to provide requested services, Mother may bring the matter before the court." *See* CYS Exhibit 1, Exhibit 8 (permanency review order, 10/6/22) (cleaned up); N.T., 6/13/23, at 149. Again, the court characterized Mother as noncompliant with the permanency plan and recognized no progress alleviating the circumstances which necessitated placement. *See* CYS Exhibit 1, Exhibit 8 (permanency review order, 10/6/22).

remained in the recovery house and was engaged in a general outpatient treatment program after completing an intensive outpatient treatment program. *See* N.T., 6/13/23, at 84, 159.

Mother, for the first time, requested visitation with Child on January 27, 2023, and raised the issue at a March 7, 2023 permanency review hearing. *See id.* at 136, 146-154. During a conference on March 21, 2023, the court requested an evaluation to determine the potential impact of visitation on Child. The Agency retained Karen Dybner-Madero, Psy.D., a certified school psychologist and licensed clinical psychologist, who conducted a psychological evaluation of Child and a bonding evaluation of Child and Foster Parents.[5] *See* CYS Exhibit 1, Exhibit 11 (N.T., 3/21/23), at 10-12.

On March 8, 2023, the Agency filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511 (a)(1), (2), (5), (8), and (b). The orphans' court held an evidentiary hearing

---

[5] Dr. Madero conducted a psychological evaluation of Child as a result of Mother's request for visitation. *See* N.T., 6/13/23, at 45. She further conducted a bonding evaluation between Child and his foster parents in order to "provide information about permanency and [whether] it was in [Child's] best interest to remain and be adopted" by Foster Parents. *See id.* at 58. Dr. Madero's reports, dated May 8, 2023, and June 1, 2023, respectively, are appended to CYS Exhibit 1 as Exhibits 13 and 14.

on June 13, 2023. At the time, Child was almost seven years old.[6, 7] The Agency presented the testimony of Foster Parents; its caseworker, Queoni Hubbard; and Dr. Madero, whom the court accepted as an expert in child psychology, without objection. *See id.* at 43-44.

Mother testified on her own behalf. She also presented the testimony of certified alcohol and drug counselor, Joe Beck, and owner of Freedom House

_____

[6] Child's best interests and legal interests were represented by Alice Miller, Esquire, his guardian *ad litem* ("GAL"). Attorney Miller indicated, and the court concluded, that there was no conflict between such interests. *See* N.T., 6/13/23, at 6; Decree, 7/12/23, at ¶ 5 As such, we conclude that Child's statutory right to counsel pursuant to 23 Pa.C.S.A. § 2313(a) was satisfied by the dual representation of Attorney Miller. *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1238 (Pa. 2020) (holding appellate courts should engage in "limited sua sponte review" concerning a child's statutory right to counsel in the termination context).

[7] The orphans' court interviewed Child the day prior to the subject hearing. As stated by the court:

> This court met with Child . . . . No recording or transcript was made of the meeting. The GAL and Child's foster parents were present. All other counsel of record consented to the meeting going forward without their being present. At the termination hearing the next day, the court gave a summary of the meeting, including Child's comments that he very much wanted to be adopted and that he considered his foster siblings to be his brother and sister. No counsel objected.

Orphans' Court Opinion, 9/12/23, at 8 n.8 (cleaned up).

recovery residences, Ms. Helen Maloney. The court also heard from the Court-Appointed Special Advocate, Betty Ann Roth.[8]

By decree dated and entered July 12, 2023, the orphans' court involuntarily terminated Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b). Thereafter, on August 3, 2023, Mother filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The court filed a responsive Rule 1925(a) opinion on September 12, 2023.

On appeal, Mother raises the following issues for our review, which we reorder for ease of disposition:

1. The decision of the trial judge was against the weight of the evidence;

---

[8] While the notes of testimony for the June 13, 2023 hearing do not appear in the certified record, they are included in the reproduced record. Because no party disputes the authenticity of the notes of testimony in the reproduced record, we have considered them. *See Commonwealth v. Holston*, 211 A.3d 1264, 1276 (Pa. Super. 2019) (*en banc*) (citing *Commonwealth v. Brown*, 52 A.3d 1139, 1145 n.4 (Pa. 2012)).

Additionally, Mother's Exhibits 1 through 7 and CASA Exhibit 1, admitted at the subject hearing, were also not contained in the certified record. Nevertheless, we do not find this omission hampers our review, given the testimonial evidence. We, however, remind counsel, "Appellant has the responsibility to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Commonwealth v. Wint*, 730 A.2d 965, 967 (Pa. Super. 1999); *see also* Pa.R.A.P. 1921 Note (stating, "Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials.") (citation omitted).

2. The decision of the trial judge is contrary to the evidence presented and the amount and weight of the factors favoring Mother;

3. The orphans' court abused its discretion by giving significant weight to the testimony of Dr. Karen Madero, who had minimal involvement to this case, whose testimony included only evaluations of Child made at the request of the CYS. Dr. Madero had no contact with Mother;

4. Based upon the entire record in these proceedings, the [decree involuntarily terminating Mother's parental rights] is an abuse of discretion.

5. The orphans' court abused its discretion by giving significant weight to the testimony of Dr. Karen Madero, an Agency contracted child psychologist, whose opinions, upon which the court relied, went beyond the scope of her training and clinical expertise.

6. The orphans' court erred in considering the Agency's petition to terminate the rights of [Mother] when subsidized permanent legal custodianship would be the more appropriate and least restrictive goal. Child currently resides with a relative of Mother and therefore termination of Mother's rights should have been avoided;

7. Counsel for Mother was ineffective in failing to object the unqualified testimony of Dr. Madero, which the court relied heavily upon in making its determination;

8. Counsel for Mother failed to advocate for permanent legal custody which constituted a deficient performance and thus deprived Mother of her statutory right to effective assistance of counsel;

Mother's Brief at 6-7 (cleaned up).[9]

---

[9] At the time of the filing of Mother's appellate brief, Mother was represented by new appellate counsel.

We review involuntary termination orders for an abuse of discretion, which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An abuse of discretion in this context exists "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*.

The involuntary termination of parental rights is governed at statute by Section 2511 of the Adoption Act, which requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under one of the eleven enumerated grounds set forth at Section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which focuses upon the child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must satisfy both Section 2511(a) and (b) by clear and convincing

evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **C.M.**, 255 A.3d at 359 (citation omitted).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

In order to satisfy Section 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). This Court has acknowledged:

> [T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care.

*Id.* at 11-12 (emphasis in original; internal citations omitted).

Finally, this Court has also explained that,

while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

With respect to Section 2511(b), the court is required to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Regarding the "emotional needs and welfare" of the child, our precedent has interpreted it to include "intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and quotation marks omitted).

Our Supreme Court in *In re E.M.*, 620 A.2d 481 (Pa. 1993), first recognized that the "emotional needs and welfare" analysis under Section 2511(b) should include, in part, the child's bond with his or her parent. In doing so, the orphans' court must examine the effect on the child of severing such a bond, and this includes "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023). The High Court explained:

Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm. *See E.M.*, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such

- 11 -

that, if the bond were broken, the child could suffer extreme emotional consequences").

**K.T.**, 296 A.3d at 1109-1110 (some citations omitted).

As such, the **K.T.** Court distinguished "extreme emotional consequences" from an "adverse impact" to the child when parental rights are terminated. **Id.** at 1111. Specifically, the Court cautioned that the orphans' court "must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." **Id.** at 1114. The Court concluded, "to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." **Id.**

The evaluation of a child's respective bonds is not always an easy task. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

Moreover, in reiterating that the parental bond is only one part of the analysis, the **K.T.** Court held that the "Section 2511(b) inquiry must also include consideration . . . [of] certain evidence **if it is present in the record**." 296 A.3d at 1113, n.28 (emphasis in original). The specific evidence at issue in **K.T.** related to the child's need for permanency and the length of time she had spent in foster care; the pre-adoptive nature of her foster home

and the child's bond with foster parents; and whether the foster home met the child's developmental, physical, and emotional needs. *Id.* at 1112. The Court emphasized, however, that these foregoing factors were not an exhaustive list for consideration under all Section 2511(b) analyses. *Id.* at 1113, n.28. Rather, the *K.T.* Court found, as noted above, that the particular facts of each case determine the factors to be considered.

The Court recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *Id.* at 1109. For instance, if relevant in a case, the orphans' court "can equally emphasize the safety needs of the child" in its analysis under Section 2511(b). *See In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014).

Turning to the merits of Mother's appeal, we address her first through fifth issues together as they are related. The crux of Mother's argument is that the orphans' court erred and abused its discretion in improperly weighing the testimony of Dr. Madero, who opined that it was contrary to Child's best interests to begin supervised visitation because Mother had not demonstrated an adequate period of sobriety. *See* Mother's Brief at 14-22. Specifically, Mother asserts that Dr. Madero was not qualified to provide an expert opinion on the substance abuse recovery process. See i*d.* at 16. Mother further

- 13 -

highlights Dr. Madero's minimal involvement in the case, noting that Dr. Madero met with Child twice and did not meet with Mother at all. ***See id.*** at 19. Mother also contends that Dr. Madero failed to consider the "potential for a strong and loving bond between" her and Child in the future. ***Id.*** at 22. Mother's claims fail.

As established, Dr. Madero was referred by the Agency to conduct an evaluation to determine the potential impact on Child of initiating visitation with Mother, as well as a bonding evaluation. ***See*** N.T., 6/13/23, at 45, 58; ***see also*** CYS Exhibit 1, Exhibits 13 and 14 (Dr. Madero reports). Dr. Madero testified that Mother still required more time with her treatment and recovery. She opined that Child should not be returned to Mother at this time as Mother needed a longer period of sobriety. ***See*** N.T., 6/13/23, at 71. Dr. Madero stated as follows:

> Q. Doctor, . . . you stated that in order for visits to start with Mother and Child, you're looking for a longer period of sobriety, you're looking for a more demonstration of her ability to stay off drugs and a sort of discussion about her living not in a recovery home, but managing the day-to-day stresses. You specifically said leaving the halfway house as we know a recovery house for a minimum of six months before you think even visits should start. Is that accurate?
>
> A. Yes.
>
> Q. And so today would it be your opinion that Child could not be returned to mom today?
>
> A. Absolutely not.
>
> Q. And that opinion would be based on her substance abuse.

A. Yes.

Q. And it would be - it would not be for a significant period of time that Child could be returned due to her history and her substance abuse issues?

A. I think it would - yes, I think a significant amount of time needs to pass with her being stable before any thought could be lent to, you know, the relationship being reopened.

*Id.* at 71-72.

Significantly, Dr. Madero was not a treating expert and received a referral for a limited purpose. She was accepted as an expert in child psychology and testified that her opinions were within a reasonable degree of professional certainty. *See id.* at 41, 63. In response to the court's specific questioning with regard to her knowledge of substance abuse and recovery in relation to visitation, she highlighted her 20 years of clinical experience and confirmed the issues were "within the realm of [her] professional knowledge and opinions." *Id.* at 73-75.

Additionally, Mother's argument fails to appreciate that Dr. Madero's testimony was confirmed by Ms. Hubbard who also believed that Mother was not "ready, willing, and able" to care for Child. *Id.* at 142. She stated, "Mother resides in a recovery house and so she does not have appropriate housing to be able to take Child back at this time. And then she is still currently in treatment for her substance use and mental health as well, so at this point today she would not be able to take Child back today." *Id.* at 132.

Moreover, Mother herself expressed that she did not want to leave the recovery house until she had been there one year, which would have been six months subsequent to the termination hearing. *Id.* at 164. Rather, she stated that she wanted Child to remain with Foster Parents. *Id.* at 166. Mother testified:

Q. What is it that you're asking the court to do today?

A. To not terminate my rights.

Q. . . .But you want - like what happens to [Child]? Just keep him in limbo until some time in the future? Like what happens to [Child]'s permanency? What do you want the Judge to do with [Child]?

A. I would like [Child] to stay with my sister until I leave my recovery house.

Q. Would you agree with me that today you're not ready to take [Child]?

A. If I'm thinking . . . about my recovery, no, I wouldn't do that for him only. I would want to be stronger.

*Id.* at 165-66.

Regardless of any progress, "Mother was still incapable of parenting Child, and would remain incapable of caring for Child for at least another six months to a year, maybe longer." Orphans' Court Opinion, 9/12/23, at 17. The testimonial evidence overwhelmingly supports the court's conclusion that reunification of Mother and Child was not imminent at the time of the subject hearing. *See In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Inasmuch as there is additionally no dispute that Child had been officially removed from

Mother's custody for approximately two years at the time of the subject proceeding, we therefore discern no abuse of discretion by the court with respect to the first and second elements of Section 2511(a)(8). As the court stated,

> Based on the clear and convincing evidence presented at the termination hearing regarding the amount of time that Child had already been in placement, Mother's extended lack of contact with Child, Mother's continued inability to care for Child, Mother's ongoing treatment needs, Mother's speculative plans, and Child's need for permanency and stability, this could not give Mother any more time.

Orphans' Court Opinion, 9/12/23, at 17-18.

The record also supports the court's determination as to the third and final aspect of Section 2511(a)(8), that termination will best serve the needs and welfare of Child. Specifically, Foster Parents testified that Child was exhibiting problematic behaviors upon his arrival in their home. *See* N.T., 6/13/23, at 9-10, 19-20; *see id.* at 156. Foster Mother explained, "He was having like traumatic nightmares or night terrors in the middle of the night. He was not sleeping through the night. He would be up screaming in the hallways. . . . And he was aggressive. We're not really sure why. . . . Sometimes maybe there was a reason, but for the most part it was just anger, destructive kind of behaviors. *Id.* at 19-20. Foster Parents engaged Child in therapy and, by all accounts, he has adjusted and is thriving in their household. Foster Father stated, "We've taken [Child] to see a therapist on a weekly basis. It helped a lot with his behavior, with teaching us ways to cope

with, you know, how to help him, you know, just deal with the situation. And there's been remarkable improvement, especially in the last few months. He's very well adjusted and very happy." *Id.* at 9-10. Foster Father continued, "I mean he's healthy and he's well adjusted I would say. I mean his therapist is really happy with his progress, and there's a noticeable difference that he's really feeling a lot more comfortable with us." *Id.* at 11.

Moreover, both Dr. Madero and Ms. Hubbard confirmed that Child's relationship with his foster family has benefitted him emotionally and cognitively. *See id.* at 63, 140. Dr. Madero testified:

> Q. Does the relationship that [Child] has with his foster family
> provide security for him and help him develop emotionally and
> cognitively?
>
> A. Oh absolutely. I think the changes he's made and the
> progress he's made is because of that.

*Id.* at 63. Thus, we likewise discern no abuse of discretion by the court in concluding that the termination of Mother's parental rights will best serve Child's needs and welfare pursuant to Section 2511(a)(8).

Mother's first through fifth issues also implicate Section 2511(b), inasmuch as the court found that termination served Child's developmental, physical, and emotional needs and welfare. The court reasoned:

> Dr. Madero was appointed to conduct a bonding evaluation
> of Child and Foster Parents. The evaluation was conducted on
> June 1, 2023. A copy of the evaluation was admitted into evidence
> without objection. Dr. Madero concluded that Child is bonded with
> his foster parents . . . and that bond has become very central to
> Child's sense of well-being . . . . The foster family is Child's
> emotional family. It is essential that Child be offered permanency

- 18 -

to ensure his continued growth and well-being. . . . Foster Parents (should be) considered as an adoptive resource. Dr. Madero concluded that terminating Mother's parental rights was in Child's best interests.

Dr. Madero's testimony bolstered her written report. Dr. Madero testified that Foster Parent's home is a place where Child feels protected and safe. Child has a sense of belonging with his foster family. Child is very bonded with his [foster parents]. The foster family gives Child confidence. The relationship between Child and his foster family provides Child with security and will help Child develop emotionally and cognitively.

The GAL reported that Child doesn't remember the last time he saw his Mother. Child wants to stay with his [foster parents] and be adopted by them. The GAL testified that termination and adoption were in Child's best interests. Foster Father testified that Child has become part of our family in every way. Child and Foster Parents' biological children interact like siblings. Foster Parents' biological children are Child's first cousins, but Child refers to them as his brother and sister.

The CYS Caseworker, Ms. Hubbard, testified that Child is integrated into Foster Parents' lifestyle and family. The relationship with the foster family was beneficial to Child and was helping Child develop cognitively and emotionally. Ms. Hubbard testified it is in the best interest of Child to remain with his foster parents and to be adopted by them.

Child's current relationship with his Mother was described much differently than his relationship with his foster parents. Child had no memory of living with Mother. Dr. Madero did not get any sense that Child was missing or longing for his mother. Dr. Madero testified that she did not think Child currently has a relationship with Mother and she didn't think Child has had one for a while. Ms. Hubbard also testified that she did not believe that Child had any relationship with his mother.

By all accounts Child is thriving with his kinship foster parents. . . . No evidence was presented that terminating the parental rights of Mother would be detrimental to Child. The record was clear that termination was in the best interests of Child.

Orphans' Court Opinion, 9/12/23, at 22-24 (cleaned up) (citations to record omitted) (internal quotation marks omitted).

Notably, Dr. Madero and Ms. Hubbard both indicated the lack of relationship between Child and Mother. Dr. Madero explained:

> I don't think he has a relationship with her now. And I don't think he's had one for awhile. And I think that bringing her back into his life I think is going to create some stress for him. And I think that if it happens and when it happens, it has to be done very therapeutically if it happen[s], with the assistance of a therapist, and it has to be done slowly, if it happens. But I don't think it should happen without some better guarantees about [Mother]'s stability.

*Id.* at 62-63. Further, Ms. Hubbard testified:

> Q. During the time that you visit with [Child], has [Child] ever brought up the subject of [Mother]?
>
> A. No.
>
> Q. From what you observed or based on what you discussed with [Child], if you did, do you believe that there's a relationship between [Child] and his mom?
>
> A. . . .I don't believe that there is any relationship at least that he can remember.

*Id.* at 140-141.

Instead, both Dr. Madero and Ms. Hubbard testified to a strong relationship between Child and foster family and that, as a result, it is in Child's best interests to terminate Mother's parental rights. Dr. Madero described Child's relationship with his foster family as follows:

> So[,] I do think that [Child] is very bonded with [Foster Parents]. He has individual relationships with them. He does sports with his uncle. He shares that. His uncle is home during the day when he

gets home from school. I think he feels very connected to his aunt who helps him fall asleep at night. They have long talks. He's very connected to the [foster parents' children]. He feels that he is part of this family and there is a strong bond, and they care a lot about him, and they have worked hard to help him overcome some of the behavioral challenges with which he presented when he first came to them. And they worry about him. And I think it is in his best interest to remain here and to have permanency. I think that his sense of family and belonging gives him a sense of security and stability that he needs for his emotional wellbeing.

N.T., 6/13/23, at 61-62. She further testified:

Q. Do you believe the relationship that he has with his aunt and uncle, the foster family, is a beneficial relationship for [Child]?

A. Yes.

. . .

Q. How essential is permanency to him at this time?

A. I think it's pretty essential. I think he's aware that he could be adopted, and I think he wants to be adopted. I think it gives him a sense of belonging and having a place in this family that feels more secure.

*Id.* at 63.

Similarly, Ms. Hubbard attested:

Q. How would you characterize [the relationship between Child and Foster Parents]?

A. I would say that [Child] is definitely integrated into their lifestyle and to their family. [Child] has his own hobbies. He refers to like his cousins as his brother and sister. He has I would say a really good relationship with [Foster Parents].

Q. Would you say that this relationship that they have is beneficial to [Child]?

A. Yes.

. . .

Q. Do you believe it is in the best interest of [Child] to remain with his foster parents and be adopted?

A. Yes.

*Id.* at 139-140.

Moreover, Child's CASA testified that Child has become "more comfortable in the home, more comfortable with the family, and I've seen – it just seems like a unit now. . . . I've seen a lot of love and a lot of support, and he seems to be thriving." *Id.* at 169-170. As reported by Child's GAL, Child "doesn't remember the last time he saw his mother," whom he refers to by her first name. He wants to remain in his foster home with his cousins, whom he refers to as his brother and sister, and be adopted. *Id.* at 5.

Based on the foregoing, we observe no abuse of discretion or error of law in the orphans' court's findings pursuant to Section 2511(a)(8) and (b), and we will not disturb them. Mother and Child do not share a necessary and beneficial relationship pursuant to Section 2511(b). *See K.T.*, 296 A.3d at 1113. Indeed, the record reveals no bond existed as Mother abandoned Child three years prior to the subject hearing. Rather, Child shared a bond and beneficial relationship with his foster family, where he desires to remain.

To the extent Mother raises an issue with respect to permanent legal custody, we note that Child's goal was changed from reunification to adoption in October 2022. Notwithstanding, such a challenge is not appropriately before this Court as Mother's above-captioned appeal lies solely from the

orphans' court's termination decree. *See Interest of S.S.*, 252 A.23d 681, 688 (Pa. Super. 2021) (recognizing that dependency proceedings and termination proceedings are two separate, distinct proceedings "with their own docket numbers, records, and divisions within the Court of Common Pleas."). Thus, as a matter of justiciability, we cannot address Mother's sixth claim for relief. The issue is likewise waived as Mother failed to raise it in her concise statement. *See M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (reiterating that issues not included in a concise statement of errors complained of on appeal and statement of questions involved are waived).

Finally, with her seventh and eight issues, Mother raises issues of ineffectiveness of counsel. Specifically, Mother asserts that trial counsel was ineffective in failing to object to Dr. Madero's opinion testimony and in failing to argue for permanent legal custody. *See* Mother's Brief at 25-29.

As to a claim of ineffectiveness of counsel in this context, this Court has stated:

> In the context of a termination proceeding, the best approach to suggest itself is the fundamental fairness doctrine whereby, in the exercise of its broad scope of review, an allegation of ineffectiveness of counsel on appeal would result in a review by this Court of the total record with a determination to be made whether on the whole, the parties received a fair hearing, the proof supports the decree by the standard of clear and convincing evidence, and upon review of counsel's alleged ineffectiveness, any failure of his stewardship was the cause of a decree of termination. Mere assertion of ineffectiveness of counsel is not the basis of a remand or rehearing, and despite a finding of ineffectiveness on one or more aspects of the case, if the result would unlikely have been different despite a more perfect

stewardship, the decree must stand. *In re K.D.*, 871 A.2d 823, 828 (Pa. Super. 2005) (citation omitted). Given the ample evidence in support of the termination decree beyond the testimony of Dr. Madero, as addressed *supra*, and our disposition of Mother's other claims, any argument of ineffectiveness of counsel likewise fails.[10]

Thus, we affirm the decree involuntarily terminating Mother's parental rights.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/1/2024

---

[10] Mother's reliance on *Interest of D.N.G.*, 230 A.3d 361, 363 (Pa. Super. 2020), is unfounded as *D.N.G.* involved consolidated appeals from a contemporaneous termination decree and goal change order.

- 24 -